# Kentucky Utilities Co. v. City of Paducah et al.

June 15, 1948.

As Extended on Denial of Rehearing October 29, 1948.

James G. Wheeler, Squire R. Ogden, Clifford E. Smith, Wheeler, Marshall & Shelbourne and Ogden, Galphin & Abell for appellant.

Adrian H. Terrell, Terrell & Schultzman and Waller, Threlkeld & Whitlow for appellees.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

City of Paducah and its officials, the appellees, filed suit under declaratory judgment law against Kentucky Utilities Company, the appellant, seeking a declaration of the existing rights between these parties under a 1940 electric franchise and also seeking a mandatory injunction against the company to require the latter to appoint an appraiser as a preliminary step looking toward an acquirement by the city of the company's property at Paducah. The chancellor having declared that the city's acquirement rights under the franchise are valid and that the city's acquirement and operating rights under the so called TVA Act are also valid and that the company must appoint an appraiser in the acquirement procedure, the company now brings us this appeal.

The company's contentions are that the chancellor's judgment is reversibly erroneous (1) because the General Assembly's 1942 TVA Act provided an exclusive plan of electric plant acquirement intended to supplant the acquirement plan provided in the 1940 franchise and (2) because the city has not legally proceeded to embrace the TVA Act so as to operate thereunder and (3) because the city appointed a disqualified appraiser and (4) because the appraisers, after their appointment, invalidated their own creation and function by failing to make a report within the time provided by the franchise.

In 1940, as indicated, the city granted a 20 year electric franchise to this company. Under Section 7 of the franchise, the city had a right to revoke that instrument upon 18 months' written notice to the company and also upon simultaneous notice of the city's desire to enter an agreement with the company as to a valuation of the company's property looking toward acquisition by purchase through proceeding under Sec. 3480d-3, Ky. Statutes (now KRS 96.520). Sec. 7 of the franchise also provided, in general substance, that in the event no valuation agreement between the parties should be reached within 60 days after the acquirement notice, then a Board of Appraisers should be organized, same to be

constituted with two members, one member to be named by the city's mayor and one to be named by the company; that in the event no valuation agreement should be reached by the two members, then they should name a third member; that in the event no agreement should be reached by the two members as to the naming of a third member, then the Judge of the United States District Court for the Western District of Kentucky should, on application of the city or the company, name the third member; that the valuation agreement arrived at by as many as two members of the Board of Appraisers and then submitted to the city in writing should constitute the purchase price of the company's property.

It appears that this 1940 franchise refers to KRS 96.520, or to *such other legislative act as might be in effect at acquirement time,* for a method of procedure, while KRS 96.520, in turn, refers to KRS 96.360 et seq., for a detailed outline of the specific requirements to be followed by a city in carrying out a purpose such as this. This statutory outline provides an election opportunity, if properly sought, on behalf of the city's voters on the proposition of purchase at the price pronounced by the official appraisal. This statutory outline further provides that if such popular election favors the purchase, then the city may issue its revenue bonds to raise the necessary funds to complete the transaction. Thus, we perceive that Paducah has, since 1940, had a complete method, by franchise and statutory provisions, for acquirement of this company's property.

In 1942, there was enacted into law what we have already referred to as the TVA Act. It is now KRS 96.550 et seq. This Act sets up its own complete method of municipal acquirement of an electric service enterprise. The method of the Act is similar to the method of the franchise, but the two methods are far from identical. Among other things, the Act provides that it furnishes the "complete law" relating to municipal acquirement of electric plants after date of June 1, 1942; that all laws in conflict are repealed; that cities desiring to acquire and operate plants under the Act must pass ordinances indicating their complete acceptance and agreement for acquirement and operation under the Act; that cities desiring to come under the Act must set up corporate bodies known as "Electric Plant Boards,"

which thereafter "have charge of the general supervision and control of the acquisition, improvement, operation and maintenance" of the electric plants encompassed by the Act.

■ The first question is whether the 1942 TVA Act blotted out the 1940 franchise provisions as to the city's purchase right and acquirement method relating to this company's property. We believe the answer to that question must be in the negative. Sec. 19, Ky. Constitution, says that no law impairing the obligation of contracts shall be enacted by legislative authority. We believe that this company had a contractual obligation unto the City of Paducah within and under its 1940 franchise. This contractual obligation provided for an acquirement right to be enjoyed by the city through following a definite plan based on agreement or, in the alternative, on appraisal. So long as the Constitution still stands there can be no legal removal, whether by attempted executive, legislative or judicial process, of the contractual rights of the city under that 1940 solemn compact, which was unfalteringly granted by the city and faithfully accepted by the company as a working agreement of property acquirement enduring until the year 1960. See Union Light, Heat & Power Co. v. City of Ft. Thomas, 215 Ky. 384, 285 S. W. 228. Therefore, we now hold that the 1942 TVA Act did not impair, diminish nor supplant the city's contractual right of property acquirement under the 1940 franchise.

■ The second question is whether the city has proceeded legally within the TVA Act so as to invoke its benefits for future operation thereunder. The company directs our particular attention to a section of the Act declaring that cities desiring to come within it must accept *all* its provisions. Yet Paducah has accepted the Act's provisions, says the company, only to the extent that they do not encroach upon the city's contractual rights as set out in the 1940 franchise. Our interpretation of the TVA Act is that it constitutes an established means whereby cities may own and operate their own electric plants for the benefit of the consuming public. Therefore, we cannot contemplate that the General Assembly intended to fashion the Act so as to frustrate a city from enjoying any of its contractual advantages previously acquired under an existing franchise. When

the TVA Act specified that a city must accept *all* provisions of the Act in order to come within it, the intended meaning was surely not that the accepting city must, in order to come under the Act, surrender some previously bargained benefit, whether in the form of a load of lumber or in the nature of a right to buy an electric plant. And so, we do not believe that the city has violated the spirit or the broad purpose of the TVA Act in taking hold of the Act with the municipal right hand while keeping tight grip on its 1940 acquirement privilege with the municipal left hand.

■ The third question is whether the city's appraiser appointed in the acquirement procedure is disqualified to act in that capacity. The city appointed L. R. Howson, an engineer of some standing and ability. But the company contends that he is disqualified because he is in the employment of the city and because he had, prior to his appointment as the city's appraiser, made a valuation report on this same property he is now obligated to value anew in the acquirement procedure. However, we do not believe that Howson's employment with the city should warp his mind in his present duty as an appraiser. Any appraiser appointed by the city would be employed by the city to the extent of such appointment and at least in that one respect. Howson's previous knowledge on the subject of this valuation should not alienate him from a desire to be completely fair and righteous in this new appraisal undertaking. But above and beyond these considerations, we recognize that the crucial "balance of power" in this valuation procedure will rest in the third member of the Board of Appraisers. And the third appraiser will not be *of the city* nor *of the company* but *of the United States Court* in accordance with the stipulation of the 1940 franchise. No qualifications whatever for the appraisers were mentioned in the franchise. It did not specify *who* should be appointed but merely *how* they should be appointed. Therefore, we infer that the qualifications and personalities of the appraisers were not vitally important. And so, we now hold that the city appointed an appraiser who was not disqualified under any provision or limitation of the franchise for his task of placing a fair valuation on the company's property.

■ The fourth question is whether the appraisers

have, under terms of the franchise, invalidated their own creation and function by failing to make a written report within 6 months after appointment. That question must, we believe, be answered in the negative. The company invokes certain language of the franchise in support of its contention that the appraisers are now under discharge and disruption for failing to report within 6 months. The language is as follows:

"* * * In the event that two of the three members cannot agree within six (6) months after the appointment of the first two members, then in such event the entire first board shall be discharged and cease to function, and in such event a second board may be appointed immediately, as herein provided." It will be observed that the quoted language seems to contemplate that it is the full board of three members that shall be penalized by discharge on the ground of time expiration. But we gather from the record that there has never been a full three-member Board of Appraisers up to the present time. This litigation has interfered with the incomplete two-member board's opportunities either for an agreement as to value or for an agreement as to a third member in the event of disagreement as to the valuation. In other words, this litigation seems to have stopped the hands of the clock for these two appraisers and seems only to have encouraged them to look glumly at each other pending the outcome of this legal contest. And so, we consider that the time limitation of this franchise on the subject of the appraisers' report has no application whatever to the initial two-member board, which is, we think, still operating as a "going concern" under full authority to appraise this property with fairness and justice to both sides in interest.

In addition to the company's enumerated contentions already discussed, it appears that the company's reply brief made the additional and final contention that the company has, by the chancellor's judgment upholding the city's right to appoint Howson as an appraiser, been deprived of its property without due process of law and, therefore, in violation of the Constitution of the United States. We cannot agree with that viewpoint. Our reasons have already been stated as to why we look upon this entire appraisal procedure as one calculated to

produce a full measure of fairness to both sides in the finality of its operation. We do not see how any conclusion could yet be drawn on the subject of property deprivation, since neither appraisal nor valuation has been made upon the company's property. The appraisal might be such as to produce an increase of property, instead of a deprivation thereof, by virtue of the very abundance of this forthcoming valuation. It seems to us that the company's present concern of paramount consideration in this dispute is *property valuation*. All things else are secondary to that consideration. *Property retention* has been "down the river" since 1940, when the company contracted away its right of retention at the city's desire to acquire. The company can not logically be concerned with the mechanics of the city's plan of operation after the acquirement. The company must now be primarily concerned only with a price tag. Since the price tag has not yet been written or hung, there can not yet arise in this dispute a very clear conception of that intangible thing called justice. In fact, the issue of justice in the matter of this property valuation may never be joined at all. The price tag, after it has been written and hung, may be as honest as a looking glass, truly and completely reflective of the value standing before it.

Wherefore, having carefully considered the chancellor's judgment in the light of all contentions presented by the appellant company and having reached the conclusion that there is no prejudicial error within the judgment, the same is now hereby affirmed.